IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

VINCENT S. ASARO,

                    Plaintiff,                          CV-09-295-ST

         v.                                OPINION AND ORDER

SEALY MATTRESS MANUFACTURING, INC.,

                    Defendant.

STEWART, Magistrate Judge:

## **INTRODUCTION**

       Plaintiff, Vincent Asaro ("Asaro"), filed this complaint in the Multnomah County Circuit

Court for the State of Oregon against his current employer, Sealy Mattress Manufacturing, Inc.

("Sealy"), alleging claims for retaliation in violation of ORS 654.062 (Counts 1 and 2),

retaliation in violation of 659A.230 (Count 3), and intentional infliction of emotional distress

("IIED") (Count 4).  Asaro seeks an award of damages and non-economic damages in the total amount of $1,975,000.00 and attorney fees.

Asaro is a citizen and resident of the State of Oregon.  Sealy is a corporation incorporated under the laws of Delaware with its principal place of business in North Carolina.  Based on diversity jurisdiction under 28 USC § 1332, Sealy timely removed the case to this court under 28 USC § 1441.

All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c).

Sealy has filed a Motion for Summary Judgment (docket # 34) against all of Asaro's claims.  For the reasons set forth below, Sealy's motion is GRANTED.

## STANDARDS

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any material fact and "the moving party is entitled to judgment as a matter of law."  The moving party must show an absence of an issue of material fact.  *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986).  Once the moving party does so, the nonmoving party must "go beyond the pleadings" and designate specific facts showing a "genuine issue for trial."  *Id* at 324, citing FRCP 56(e).  The court "must view the evidence on summary judgment in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party." *Nicholson v. Hyannis Air Serv., Inc.*, 580 F3d 1116, 1122 n1 (9th Cir 2009) (internal quotation omitted).

The court must "not weigh the evidence or determine the truth of the matter, but only [determine] whether there is a genuine issue for trial." *Balint v. Carson City, Nev.*, 180 F3d

1047, 1054 (9th Cir 1999) (citation omitted).  A "'*scintilla* of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material fact.  *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert denied*, 493 US 809 (1989) (emphasis in original) (citation omitted).  The substantive law governing a claim or defense determines whether a fact is material.  *T. W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F2d 626, 630 (9th Cir 1987).

The Ninth Circuit has cautioned against too readily granting summary judgment in employment discrimination cases because of " the importance of zealously guarding an employee's right to a full trial, since discrimination claims are frequently difficult to prove without a full airing of the evidence and an opportunity to evaluate the credibility of the witnesses."  *McGinest v. GTE Serv. Corp.*, 360 F3d 1103, 1112 (9th Cir 2004); *see also Oncale v. Sundowner Offshore Serv., Inc.*, 523 US 75, 81-82 ("The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.").  Thus, the Ninth Circuit has set "a high standard for granting summary judgment in employment discrimination cases."  *Schindrig v. Columbia Mach., Inc.*, 80 F3d 1406, 1410 (9th Cir 1996), *cert denied*, 519 US 927 (1996).  Courts require "very little evidence to survive summary judgment in a discrimination case, because the ultimate question is one that can be resolved only through a searching inquiry – one that is more appropriately conducted by the factfinder upon a full record."  *Id* (internal quotations and citation omitted).  Additionally, "any indication of discriminatory motive . . . may suffice to raise a question that can only be resolved by a factfinder."  *Id*.  Thus, "summary judgment for the defendant will ordinarily not be

appropriate on any ground relating to the merits." *Warren v. City of Carlsbad*, 58 F3d 439, 443 (9th Cir 1995) (citations and quotations omitted). Nevertheless, the "[f]ailure to allege 'specific facts' that establish the existence of a prima facie case renders a grant of summary judgment appropriate." *Jurado v. Eleven-Fifty Corp.*, 813 F2d 1406, 1409 (9th Cir 1987) (citation omitted).

## FACTS

Asaro began employment at Sealy's Portland Plant on July 28, 2005, working first in the warehouse and then in the Secondary Bedding Unit ("SBU") as a Secondary Bedding Coordinator. Asaro Depo., p. 24.[1] In the SBU Asaro was responsible for handling and disposing of mattresses and box springs that were used and had been returned by customers. *Id,* p. 178. Pieces that were damaged, soiled or otherwise in an unsanitary condition were called Land Fill Destroy ("LFD") pieces, were processed according to Sealy's Distressed Bedding Policy and disposed of in a large outside dumpster. *Id*, p. 185; Leis Decl., Ex. 2. Sealy trained Asaro in the proper, safe handling of the LFD pieces and provided him with the necessary safety equipment. Asaro Depo., p. 178; Leis Decl., Ex. 3. Before disposing of the LFD pieces in the dumpsters, trained employees were required to remove the corner guards and other items that identified Sealy as the manufacturer. Asaro Depo., pp. 186-87, 189; Leis Decl., Ex. 4.

On January 7, 2008, Asaro told Heidi Hicks ("Hicks"), who at the time was Continuous Improvement Coordinator, that she was setting a bad example by wearing her hair loose and questioned whether she was wearing her safety glasses.[2] Asaro Depo., pp. 56-57. Consistent

---

[1]  Excerpts of Asaro's deposition are attached as Exhibit 22 to the Leis Declaration, Exhibit 1 to the Leis Supplemental Declaration, and Exhibit 16 to the Sepp Declaration. Citations are to the page number of the deposition transcript.

[2]  Asaro asserted in his April 2008 BOLI complaint that he made a safety complaint to Sealy management
(continued...)

with Sealy's No Harassment Policy,[3] Hicks reported those comments to Herberd Duran, the

Portland Plant Human Resources Administrator, in a memo dated January 7, 2008. Leis Decl.,

Ex. 5. She described Asaro's comments as "intimidating and threatening" and complained that

they made her feel uncomfortable. *Id*. She also reported that Asaro told her she was being

watched. *Id*. The next day, Duran interviewed Asaro about this event. *Id*, Ex. 6. Asaro

admitted having the conversation with Hicks, but denied saying "You've been watched" as Hicks

had reported. *Id*. Asaro believed it was a misunderstanding and apologized. Asaro Depo.,

pp. 58-59.

Approximately a week later, Hicks talked with Kenneth Steltz ("Steltz"), a warehouse

worker, about her frustration with Asaro. Leis Suppl. Decl., Ex. 11 ("Steltz Depo."), pp. 13-14.

According to Steltz, they agreed that they had to "get rid" of Asaro. *Id*, p. 14. Hicks asked Steltz

to get Asaro talking on a sexually inappropriate topic so that she might overhear and then report

him for sexual harassment. *Id*. A few days later Steltz told Hicks he did not want to be involved

in the plot and suggested they get Asaro for something he had already done. *Id*, pp. 16-17.

Hicks, however, denies both conversations. Hicks Depo., p. 39.[4]

---

[2](...continued)
that Hicks's dress was not in compliance with safety procedures. The record contains no evidence of this formal
complaint except for this conversation Asaro had with Hicks and their following conversations with Herberd Duran.
This event will hereinafter be referred to as the "safety complaint."

[3] Employees may report their concerns about an alleged harassment to their supervisor, Human Resources
Administrator or Regional Vice President of Human Resources in the event that the employees do not feel
comfortable confronting the alleged harasser directly. This policy also explains the investigation procedures used
when an allegation has been made. Leis Decl., Ex. 1.

[4] Excerpts of Hicks's deposition are attached as Exhibit 4 to the Leis Supplemental Declaration and as
Exhibit 10 to the Sepp Declaration. Citations are to the page number of the deposition transcript.

Asaro was a member of Teamsters Local 206.  On January 31, 2008, the Collective

Bargaining Agreement between Sealy and the Teamsters Local 206 expired, and negotiations

began on a new contract.  During this time the grievance process was suspended.  Blackburn

Depo., p. 38.[5]  While the contract was under negotiation, Richard Coley ("Coley"), the Plant

Manager, was responsible for the discipline of the plant employees.  Coley Decl., ¶ 4.  Hicks

became the Portland Plant Supervisor on February 25, 2008, and assisted Coley with the day-to-

day operations of the Plant.  *Id*, ¶ 5.  She sat in on disciplinary action meetings, but was not

intimately involved in disciplinary decisions.  Hicks Depo., pp. 45-46.

On March 13, 2008, Coley believed that some Local 206 members had engaged in a

deliberate work slowdown as a leverage tactic related to the contract negotiations because

production numbers for March 13 were well below established production goals.  Coley Decl.,

¶ 7; Leis Decl., Ex. 9.  As a result, on March 17, 2008, he issued a verbal warning to Asaro in the

form of a corrective action notice ("CAN") and also issued CANs to five of his co-workers for

their involvement in the incident.  Coley Decl., ¶ 7; Leis Decl., Exs. 7 & 10.  The CANs stated:

"You placed units randomly on the floor out of order.  You allowed the area to become clogged

and disorganized, creating an unsafe environment by stacking beds on top of each other where

they may fall on yourself or fellow operators."  Coley withdrew the CANs from the personnel

files after a year had passed when they could no longer be used by Sealy for purposes of

progressive discipline under the collective bargaining agreement.  Coley Decl., ¶ 7.

---

[5] Excerpts of Blackburn's deposition are attached as Exhibit 8 to the Sepp Declaration and as Exhibit 2 to the Sepp Supplemental Declaration.  Citations are to the page number of the deposition transcript.

Also on March 17, 2008, Coley issued a disciplinary action notice ("DAN") to Asaro for being late to work. *Id*, ¶ 8; Leis Decl., Ex. 8. Asaro was late to work because he was attempting to sort out a pay issue. Asaro Depo., p. 152. Coley later withdrew this DAN from Asaro's file on a non-precedent setting basis to settle Asaro's grievance process and avoid the cost of arbitration. Coley Decl., ¶ 8.

The next day on March 18, 2008, Coley issued Asaro another DAN for failing to follow management instructions. *Id*, ¶ 9; Leis Decl., Ex. 11. The DAN stated: "You were told to take pieces from stock to load and fill your truck, but instead you took pieces from other loads which it [*sic*] caused other loaders to search for stock items to replace those items you used to load your truck." Asaro disagreed with the DAN because David Stoufer had given him permission to take the pieces. Asaro Depo., p. 173; Sepp Decl., Ex. 12 (Stoufer Depo.), pp. 34-35. The DAN was later withdrawn. Coley Decl., ¶ 9.

When Coley gave Asaro these three disciplinary warnings on March 17 and 18, he had no knowledge of either the safety complaint or Hicks's report to Duran about the January 7, 2008 conversation. *Id*, ¶ 14.

Shortly after these events, Sealy's Human Resources department learned that Asaro had reported to Gene Blackburn ("Blackburn"), the Union Business Agent, that he and Joe Grant ("Grant") had been subjected to sexual harassment by Hicks.[6] Leis Decl., Ex. 12, p. 1. When interviewed as a part of an investigation, Grant confirmed that he had a conversation with Hicks that included topics that were sexual in nature in the past, but was not offended. *Id*, p. 2. He also

---

[6] Sealy submitted the investigation report for this incident. The individuals investigating it were not identified, but presumably are members of Sealy's Human Resources Department.

explained that he did not give Asaro permission to include his name in the report to Blackburn and was upset with Asaro for involving him in the complaint without his permission.  *Id.*

On April 10, 2008, Asaro filed two complaints with the Oregon Bureau of Labor and Industries ("BOLI").  His first complaint alleged that Hicks had sexually harassed him beginning in August 2007, by subjecting him to unwelcome sexual comments.  Leis Decl., Ex. 14, p. 1.  His second complaint alleged that he had been retaliated against for making a safety complaint about Hicks.  *Id*, Ex. 15.  The alleged retaliation consisted of Hicks's accusation that he was stalking her and the three disciplinary warnings issued by Coley on March 17 and 18, 2008.[7]  *Id*, p. 2.

On May 2, 2008, Coley learned that LFD pieces had been placed in the dumpster without having the corner guards removed in non-compliance with the SBU Distress Bedding Policy. Coley Decl., ¶ 11.  He instructed a member of management to direct someone to go into the dumpster and remove the guards.  *Id.*  After receiving a page call from Hicks, Jack Woodruff ("Woodruff") instructed Asaro to remove the corner guards.  Sepp Decl., Ex. 14 ("Woodruff Depo."), p. 15; Asaro Depo., p. 219.  Asaro was the only person working in the SBU at this time.  Asaro Depo., p. 211.  He went to the dumpster and removed the corner guards.  *Id*, pp. 197, 233.

On May 5, 2008, Coley issued verbal warnings in the form of CANs to Asaro and two other co-workers for failing to remove the corner guards of the LFD pieces on May 2, 2008. Coley Decl., ¶ 11; Leis Decl., Exs. 16-18.  The CANs stated:  "You as part of the secondary bedding team have failed to comply with the responsibilities that you have been instructed to

---

[7]  On September 3, 2008, BOLI reported to Asaro that it had concluded its investigation and determined that substantial evidence supported his allegations of discrimination.  Sepp Decl., Ex. 9.

perform in the past." Coley later withdrew these warnings because he was unable to determine

who was actually responsible for violating the Distressed Bedding Policy. Coley Decl., ¶ 11.

When CANs and DANs are removed from an employee's personnel file, the file contains

no record of the action and the employee suffers no financial impact. Blackburn Depo., pp. 99-

100. Disciplinary notices may also be reduced to counseling with no financial impact. *Id*.

Also on May 5, 2008, Asaro filed his third BOLI complaint, alleging that he was

subjected to unlawful employment discrimination based on his opposition to health and safety

hazards. Leis Decl, Ex. 19. He alleged that on May 2, 2008, he was forced to lift mattresses

weighing in excess of 50 pounds by himself, which was against company policy, and that he was

instructed to remove the corner guards in the dumpster, which was not a part of his normal job

and for which he had no training as a sanitation worker. *Id*, p. 1. Asaro contended that the

assignment of this task was in retaliation for his previous BOLI Complaints. *Id*, p. 2.

On June 19, 2008, Asaro suffered a work related injury. Leis Decl., Ex. 20; Asaro Depo.,

p. 244. His doctor restricted him to light duty through July 4, 2008. Leis Decl., Ex. 20.

However, Sealy had no light duty positions available within Asaro's medical restrictions due to

unrelated layoffs at the Portland Plant. Coley Decl, ¶ 13. During this time, seven other Sealy

employees requested, but were denied, light duty positions because of limited availability. Kane

Decl., ¶ 3. On October 10, 2008, Asaro was released to work without restrictions. Leis Decl.,

Ex. 21.

As a result of these events, Asaro has suffered emotional distress accompanied by acid

reflux and sleep apnea. Asaro Depo., pp. 434-41.

///

**DISCUSSION**

I.    **Retaliation Claims**

Counts 1 and 2 both allege retaliation in violation of ORS 654.062[8] related to Asaro's

safety complaint about Hicks's alleged non-compliance with Sealy's safety procedures.  Count 1

alleges that Sealy engaged in a scheme to terminate his employment by attempting to fabricate a

sexual harassment claim against him and then issued multiple, unwarranted written and verbal

warnings.  Count 2 alleges that Sealy retaliated by instructing him to remove the corner guards

from distressed bedding and issued another unwarranted, written warning.  Count 3 alleges

retaliation in violation of ORS 659A.230[9] for his April 2008 BOLI Complaints by ordering him

to perform unsafe work in a dumpster.

The proper legal framework for determining whether employment discrimination claims

under Oregon law survive summary judgment is the three-step burden-shifting analysis set forth

in *McDonnell Douglas Corp. v. Green*, 411 US 792 (1973).  *Snead v. Metro. Prop. & Cas. Ins.*

*Co.*, 237 F3d 1080, 1091 (9th Cir 2001), *cert denied*, 534 US 888 (2001) (the burden-shifting

analysis is federal procedural law which applies to cases based on diversity jurisdiction).[10]  A

---

[8]  "It is an unlawful employment practice for any person to . . . discriminate against any employee . . . because the employee . . . has [m]ade any complaint . . . under or related to [safety and health conditions]."  ORS 654.062(5)(b).

[9]  "It is an unlawful employment practice for an employer to discharge, demote, suspend or in any manner discriminate or retaliate against an employee with regard to promotion, compensation or other term, conditions or privileges of employment for the reason that the employee . . . has in good faith caused a complainant's information or complaint to be filed against any person, . . . [or] has in good faith brought a civil proceeding against the employer . . ."  ORS 659A.230(1).

[10]  Oregon has rejected the *McDonnell Douglas* burden-shifting framework.  *Williams v. Freightliner,* LLC, 196 Or App 83, 89, 100 P3d 1117, 1121 (2004); *Callan v. Confederation of Or. Sch. Adm'rs*, 79 Or App 73, 77, 717 P2d 1252 (1986).  It is unclear whether Oregon law applies where the state employment discrimination claims are premised on supplemental jurisdiction, rather than on diversity jurisdiction.  In *Whitley v. City of Portland*, 654 F

(continued...)

plaintiff must first establish a *prima facie* case by proving:  "(1) that he was engaging in a

protected activity, (2) that he suffered an adverse employment decision, and (3) that there was a

causal link between his activity and the employment decision."  *Trent v. Valley Elec. Ass'n, Inc.*,

41 F3d 524, 526 (9th Cir 1994), citing *EEOC v. Hacienda Hotel*, 881 F2d 1504, 1513-14 (9th Cir

1989).

　　　If the plaintiff succeeds in establishing a *prima facie* case, then the burden of production

shifts to the employer to articulate a legitimate, non-discriminatory reason for its adverse

employment action.

　　　If the employer does so, then the plaintiff then must prove that the employer's proffered

reason is a pretext for unlawful discrimination "either directly persuading the court that a

discriminatory reason more likely motivated the employer or indirectly by showing that the

employer's proffered explanation is unworthy of credence."  *Aragon v. Republic Silver State

Disposal, Inc.*, 292 F3d 654, 659 (9th Cir 2002) (citations and quotations omitted).  This evidence

must be both "specific and substantial" to overcome the employer's proffered legitimate reasons.

*Id.*  Additionally, "when evidence to refute the defendant's legitimate explanation is totally

lacking, summary judgment is appropriate even though plaintiff may have established a

minimum prima facie case."  *Wallis v. J.R. Simplot Co.*, 26 F3d 885, 890-91 (9th Cir1994).

　　　However, the *McDonnell Douglas* burden-shifting analysis does not apply "where the

plaintiff presents direct evidence of discrimination."  *Trans World Airlines, Inc. v. Thurston*, 469

---

[10](...continued)

Supp 2d 1194, 1212 (D Or 2009), following *Adams v. Home DepotUSA, Inc.*, No. 05-1798-ST , 2007 WL 456163
*16-17 (D Or Dec. 19, 2007), this court concluded that *Snead* does not apply to state employment discrimination
claims premised on supplemental jurisdiction.  However, in *Isom v. Legacy Good Samaritan Hosp. and Med. Ctr.*,
No. 08-204-KI, 2009 WL 2601992 * 6 (D Or Aug 20, 2009), this court concluded that the *Snead* analysis is not
changed by removal based on federal question jurisdiction rather than diversity jurisdiction.

US 111, 121 (1985); *Enlow v. Salem-Keizer Yellow Cab Co., Inc.*, 389 F3d 802, 812 (9th Cir 2004). Direct evidence is "evidence of conduct or a statement by persons involved in the decision-making process that may be viewed as directly reflecting the alleged the discriminatory attitude." *Enlow*, 39 F3d at 812, quoting *Walton v. McDonnell Douglas Corp.*, 167 F3d 423, 426 (8th Cir 1999). In short, it is "evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption." *Godwin v. Hunt Wesson, Inc.*, 150 F3d 1217, 1220 (9th Cir 998), citing *Davis v. Chevron*, 14 F3d 1082, 1085 (5th Cir1994).

A.     **March 2008 Disciplinary Actions (Count 1)**

1.     **Direct Evidence**

Asaro asserts that he has direct evidence that the March 2008 disciplinary actions were issued because of his safety complaint about Hicks. His proffered direct evidence is that shortly after he made his safety complaint, Hicks conspired to concoct a sexual harassment claim against him. He then received discipline for misconduct and acts in which he either was not involved or that otherwise similarly situated employees did not receive.

Even viewing this evidence in the light most favorable to Asaro, it is not direct evidence of retaliation by Sealy for Asaro's safety complaint. Stelz testified that he and Hicks discussed Asaro's safety complaint against Hicks and how they could get rid of him by implicating him in sexual harassment charges. Although this is direct evidence of Hicks's desire to retaliate against Asaro, Coley, and not Hicks, was responsible for the disciplinary actions. Coley Decl., ¶ 4.

Nonetheless, Asaro argues that Hicks's retaliatory motive can be imputed to Coley. The Ninth Circuit allows an imputation of retaliatory motive under some circumstances.

> If a subordinate, in response to a plaintiff's protected activity, sets in motion a proceeding by an independent decisionmaker that leads to an adverse employment action, the subordinate's bias is imputed to the employer if the plaintiff can prove that the allegedly independent adverse employment decision was not actually independent because the biased subordinate influenced or was involved in the decision or decisionmaking process. . . . Thus, if an adverse employment action is the consequence of an entirely independent investigation by an employer, the animus of the retaliating employee is not imputed to the employer. . . . Conversely, even if the biased subordinate was not the principal decisionmaker, the biased subordinate's retaliatory motive will be imputed to the employer if the subordinate influenced, affected, or was involved in the adverse employment decision.

*Poland v. Chertoff*, 494 F3d 1174, 1182-83 (9th Cir 2007) (citations and quotations omitted).

The only evidence submitted by Asaro of Hicks's involvement in his discipline is that she sat in on meetings or discussions that related to disciplinary actions of all employees. However, Hicks denied being intimately involved in any of them. Hicks Depo., pp. 45-46. In addition, when Coley issued the three disciplinary warnings to Asaro in March, he did not know about either Asaro's complaint or Hicks's report to Duran. Coley Decl., ¶ 14. In response, Asaro has offered nothing to suggest that Hicks put into motion or in any way influenced, affected or was involved in any of the decisions by Coley that gave rise to the March 2008 warnings. All he offers is speculation. Accordingly, Hicks's knowledge of the safety complaint and alleged retaliatory animus cannot be imputed to Coley.

Asaro also submits as direct evidence the temporal proximity between the time he made his safety complaint and the issuance of the disciplinary warnings. However, temporal evidence cannot support retaliation without a presumption or inference and, thus, is only circumstantial evidence. *Jordan v. Clark*, 847 F2d 1368, 1376 (9th Cir 1988).

///

13 - OPINION AND ORDER

2.      ***Prima Facie* Case**

Without direct evidence, Asaro must rely on circumstantial evidence to prove a *prima facie* case as to the March 2008 CAN and DANs.  Asaro first must show that he engaged in a protected activity.  He did so by filing a safety complaint on January 7, 2008, which is protected activity under Oregon law.  ORS 654.062.

Second, he must show that he suffered an adverse employment action.  For purposes of a retaliation claim, an adverse employment action is an "employer action[] that would have been materially adverse to a reasonable employee . . . . [T]hat means that the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination."  *Burlington N. and Santa Fe Ry. Co. v. White*, 548 US 53, 57 (2006).

In Count 1, Asaro asserts that the March 17, 2008 CAN (for clogged work area) and DAN (for being late to work) and the March 18, 2008 DAN (for failing to follow management instructions) constitute adverse employment actions that were issued in retaliation for his safety complaint.  Such discipline is similar to an undeserved negative performance review which can constitute an adverse employment decision.  *See Yartzoff v. Thomas*, 809 F2d 1371, 1376 (9th Cir 1987).

Each of these actions was later withdrawn for various reasons.  Thus, they are no longer on Asaro's personnel record.  Asaro has suffered no adverse financial impact as a result and is still employed at Sealy.  The Union does not consider removed or reduced actions to be disciplinary actions.  As a result, Sealy contends that they are not sufficiently final and permanent to be adverse employment actions.  However, in March 2008 when Asaro received these

disciplinary actions, he could not have predicted that they would later be withdrawn.  At that time, they were reasonably likely to deter him from engaging in protected activity.  In that sense, they are sufficient adverse employment actions for the purpose of a retaliation claim.

However, the same cannot be said for the alleged plan by Hicks and Steltz to implicate Asaro in a sexual harassment complaint.  Because there is no evidence that Asaro received any such complaint, the scheme cannot constitute an adverse employment action.

Third, Asaro must prove causation.  "To show the requisite causal link, the plaintiff must present evidence sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action." *Cohen v. Fred Meyer, Inc*, 686 F2d 793, 796 (9th Cir 1982) (citations omitted).  "[A] *prima facie* case may be inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory [activity]." *Yartzoff*, 809 F2d at 1376.  The showing required to meet this burden is minimal, but it is "[e]ssential to a causal link . . . that the employer was aware that the plaintiff had engaged in the protected activity." *Cohen*, 686 F2d at 796.  The Ninth Circuit has held that "when adverse employment decisions are taken within a reasonable period of time after complaints of discrimination have been made, retaliatory intent may be inferred." *Passantino v. Johnson & Johnson Consumer Prods., Inc*, 212 F3d 493, 507 (9th Cir 2000) (citing cases); *see Villiarimo v. Aloha Island Air,* 281 F3d, 1054, 1065 (9th Cir 2002) ("[C]ausation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity."); *see also Coszalter v. City of Salem*, 320 F3d 968, 977 (9th Cir 2003) ("Depending on the circumstances, three to eight months is easily within a time range that can support an inference of retaliation.").

Asaro asserts that the temporal proximity between his safety complaint in January 2008 and the disciplinary actions in March 2008 creates a causal link. However, Coley, who issued the warnings, had no knowledge of Asaro's complaints about Hicks regarding her hair and safety glasses until after he issued the disciplinary warnings. Coley Decl., ¶ 14. Therefore, the temporal proximity alone is insufficient circumstantial evidence to prove a causal connection.

Because Asaro has not submitted sufficient evidence to show a causal link, his *prima facie* case of retaliation fails.

### 3. Sealy's Justification

Even assuming that Asaro satisfies his *prima facie* case with respect to the March 2008 disciplinary warnings, Sealy has provided legitimate, non-discriminatory reasons to support them. Sealy "need not prove the absence of retaliatory intent or motive; it simply must produce evidence sufficient to dispel the inference of retaliation raised by the plaintiff." *Cohen*, 686 F2d at 796 (citations omitted). This is merely a burden of production since the ultimate burden of persuasion remains with Asaro at all times. *Id* at 796-97.

Sealy's legitimate, non-retaliatory reasons for the March 2008 disciplinary warnings are clear from the warnings themselves. On each of them, Coley indicated his good faith belief that discipline was warranted. The March 17, 2008 CAN for unacceptable performance was based on independent data that the floor's numbers were only at 49.8% of their target. Leis Decl., Ex. 9. Coley believed the workers responsible that day, including Asaro and others who also received warnings, engaged in a leverage tactic for an ongoing contract negotiation. Coley Decl., ¶ 7. With respect to the March 17, 2008 DAN for arriving late to work, Asaro admitted that he was late because he was attempting to sort out a pay issue. Asaro Depo., p. 152. With respect to the

March 18, 2008 DAN for failing to follow management instructions, Asaro admits that he took pieces from other loads to fill his order but attempts to excuse his behavior because he had received permission from a non-managerial employee. *Id*, p. 173. A rational trier of fact could reasonably conclude that these warnings were not motivated by a retaliatory animus.

### 4.    Pretext

Because Sealy has produced legitimate, non-discriminatory reasons for its adverse employment actions, "the legally mandatory inference of retaliatory discrimination arising from the plaintiff's *prima facie* case drops away." *Yartzoff*, 809 F2d at 1377. The burden then falls on Asaro to show that Sealy's explanation is a pretext for impermissible retaliation. *Id*. "This burden thus merges with [Asaro's] ultimate burden of persuading the court that [he] is the victim of retaliation." *Id*. He "can prove pretext in two ways: (1) indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer." *Chuang v. Univ. of Cal. Davis, Bd. of Trustees*, 225 F3d 1115, 1127 (9th Cir 2000) (citation omitted).

"Evidence already introduced to establish the *prima facie* case may be considered . . . ." *Yartzoff*, 809 F2d at 1377. "When that evidence, direct or circumstantial *consists of more* than the [*prima facie*] presumption, a factual question will almost always exist with respect to any claim of nondiscriminatory reason[,]" but "in those cases where the *prima facie* case consists of no more than the minimum necessary to create a presumption of discrimination . . . , plaintiff has failed to raise a triable issue of fact." *Wallis*, 26 F3d at 890 (internal quotations, citation omitted)

(emphasis and brackets in original).  Asaro must do more than simply "establish a *prima facie* case and deny the credibility of [Sealy's] witnesses."  *Id* (citation omitted).

Although Asaro did not specifically address the issue of pretext, the court looks to his evidence supporting his *prima facie* case.  At best, the evidence shows that Asaro disagreed with Coley's decisions and characterizations of the events that led to his discipline, but this is not enough to prove that Coley was motivated by retaliation for Asaro engaging in protected activity. Absent any evidence tending to prove that Coley's reasons are unworthy of credence or otherwise not believable or that he was more likely motivated by unlawful discrimination, Asaro's claim fails at the pretext level of the analysis.  *See Wallis*, 26 F3d at 890-91 ("[W]hen evidence to refute the defendant's legitimate explanation is totally lacking, summary judgement is appropriate even though plaintiff may have established a minimal *prima facie* case based on a *McDonnell Douglas* type presumption.").  Thus, summary judgment is granted as to Count 1.

## B.    May 2008 Disciplinary Warning (Count 2)

### 1.    Direct Evidence

Count 2 alleges that the May 5, 2008 CAN was issued in retaliation for Asaro's safety complaint about Hicks.  Coley issued this CAN to Asaro and other workers in the SBU for unacceptable work performance after learning that mattresses had been placed in the dumpster without having the corner guards removed.

As in Count 1, Asaro stresses that the temporal proximity is enough to support direct evidence of retaliation.  However, as previously discussed, Asaro is mistaken, and the court proceeds to evaluate the circumstantial evidence.

///

18 - OPINION AND ORDER

2.      ***Prima Facie* Case**

As in Count 1, Asaro satisfies the first and second elements of his *prima facie* case for

retaliation.  He engaged in protected activity by filing the safety complaint, and the May 5, 2008

CAN is an adverse employment action..  Coley later withdrew this warning because he was

unable to determine who was responsible for dumping the mattresses without removing the

corner guards.  Nevertheless, as discussed above, it may still be considered an adverse

employment action for the purpose of a retaliation claim.

Asaro also can establish a casual link because Coley did know of Asaro's safety

complaint when he issued the May 2008 warning only two months later.  Therefore, all elements

of a *prima facie* case are met with respect to Count 2.

3.      **Sealy's Justification**

Sealy has produced a legitimate, non-retaliatory justification for the May 5, 2008 CAN.

Removal of the corner guards was an established task for workers in the SBU for the purpose of

avoiding potential lawsuits.  Leis Decl., Ex. 2; Asaro Depo., p. 189.  After Coley learned that

members of the SBU failed to perform the task of removing the corner guards, he issued

warnings to all of them on the theory that they were collectively responsible for this task.  Asaro

was not the only one who received a CAN.  Leis Decl., Exs. 16-18.  This is sufficient evidence to

dispel an inference of retaliation.

4.      **Pretext**

To rebut Sealy's justification, Asaro points to his testimony that he was not working in

SBU on May 2, 2008, when the corner guards were discovered in the dumpster, or for the

preceding two weeks.  Asaro Depo., pp. 195-96.  However, Asaro's personal journal specifically

mentions working in SBU on April 10, 18, and 19 and on the morning of May 1, 2008. the day before discovery of the corner guards in the dumpster.  Leis Supp. Decl., Ex. 3.  Asaro admits that he kept this journal contemporaneously with the events as they transpired and that it is more accurate than his memory.  Asaro Depo., p. 288.  In addition, he admits that the corner guards could have been in the dumpster for two weeks (or longer) before being discovered which covers the time period while he was working in SBU.  *Id*, pp. 331-32.  Therefore, Asaro's testimony does not create a triable issue of material fact.

Other then the mere fact that Asaro and other members of the SBU were issued verbal warnings after Asaro made a safety complaint about Hicks, there is no evidence from which a reasonable juror could conclude that Sealy was more likely motivated by unlawful discrimination.  This claim fails at the pretext level of the analysis.  *See Wallis*, 26 F3d at 890-91. Thus, summary judgment is granted to Sealy as to Count 2.

### C.    Work Assignment of Removing Corner Guards (Count 3)

#### 1.    *Prima Facie* Case

Count 3 alleges that Sealy retaliated against Asaro for filing his April BOLI Complaints by ordering him to enter the dumpster and remove corner guards from LFD mattresses.  Asaro offers no direct evidence of retaliation and must prove the elements of a *prima facie* case.

Asaro satisfies the first element of a *prima facie* case because filing a BOLI complaint is a protected activity.  ORS 659A.230.

As to the second element, being ordered to enter the dumpster and perform unsafe and unsanitary tasks is an adverse employment action.  Removal of the corner guards was a typical duty for the SBU for which Asaro was trained.  Leis Decl., Exs. 3 & 4.  However, Asaro claims

20 - OPINION AND ORDER

that working alone in a dumpster, not on the warehouse floor, is a significant alteration to his job duties as to constitute an adverse employment action. Sealy's Safety Policy requires two people to lift the mattresses. Sepp Decl., Ex. 2, p. 2. Yet Asaro was required to do the job himself. Viewing the evidence in the light most favorable to Asaro, a reasonable jury could find that being required to work in the dumpster alone is an adverse action.

As to causation, Sealy does not deny that Coley knew of Asaro's April 2008 BOLI complaints when he gave the order, but denies that it was widely known among management. Coley Decl., ¶ 15; Defendant's Response to Plaintiff's Concise Statement of Material Facts, ¶ 5. However, Coley did not directly order Asaro to remove the corner guards. Rather, he instructed a member of management to direct someone to remove them. Woodruff explained that he received the order from Hicks and selected Asaro as the only person available that day with adequate training. Woodruff Depo., p. 15; Coley Decl., ¶ 11. Taking this evidence in the light most favorable to Asaro, this is sufficient to establish causation as Hicks was involved to some degree in the instruction to remove the guards.

Thus, Asaro has submitted the minimum evidence necessary to support a *prima facie* case as to Count 3.

### 2. <u>Sealy's Justification</u>

As justification of this action, Sealy explains that this task was not directed at Asaro. It is an important practice at Sealy to remove the corner guards to avoid potential lawsuits. Asaro agrees that Sealy has a policy to remove these guards for a legitimate business reason. Asaro Depo., p. 189. Asaro was not singled out to perform this task, but confirms that he was the only

worker available with the necessary training to remove the corner guards. *Id*, pp. 218-19. This is sufficient to rebut the *prima facie* case.

### 3.    Pretext

The problem, however, is that Asaro offers no additional evidence to prove that Sealy's justification is pretextual. In the absence of such evidence, Asaro's claim also fails at the pretext level of the analysis *See Wallis*, 26 F3d at 890-91. Thus, Sealy is entitled to summary judgment as to Count 3.

### D.    Light Duty Claim

Sealy also seeks summary judgment against Asaro's retaliation claim related to the denial of light duty. Because this claim is not alleged in the Complaint, it need not be addressed.

## II.    IIED Claim (Count 4)

Count 4 alleges that Sealy's conduct and retaliatory actions constitute intentional infliction of emotional distress for which he has incurred mental, emotional, and physical distress. To prevail on an IIED claim, a plaintiff must prove that: "(1) the defendant intended to inflict severe emotional distress on the plaintiff, (2) the defendant's acts were the cause of the plaintiff's severe emotional distress, and (3) the defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct." *McGanty v. Staudenraus*, 321 Or 532, 543, 901 P2d 841, 849 (1995), citing *Sheets v. Knight*, 308 Or 220, 236, 779 P2d 1000, 1010 (1989).

The tort of IIED "does not provide recovery for the kind of temporary annoyance or injured feelings that can result from friction and rudeness among people in day-to-day life." *Hetfeld v. Bostwick*, 136 Or App 305, 308, 901 P2d 986, 987 (1995). Outrageous conduct is "so

extreme as to warrant the imposition of liability for any severe emotional distress caused thereby." *Cantua v. Creager*, 169 Or App 81, 95, 7 P3d 693, 702 (2009). "Conduct that is merely rude, boorish, tyrannical, churlish and mean [is insufficient to be actionable, and] . . . insults, harsh or intimidating words or rude behavior ordinarily [do not] result in liability even when intended to cause distress." *Watte v. Edgar Maeyens, Jr.*, 112 Or App 234, 239, 828 P2d 479, 481 (1992) (quotation omitted). Discipline and even the act of firing an employee, even if wrongfully motivated does not transgress the bounds of socially tolerable behavior. *Madami v. Kendall Ford, Inc.*, 312 Or 198, 204, 818 P2d 930, 934 (1991), abrogated by *McGanty* on other grounds. IIED claims often involve acts of psychological and physical intimidation, racism, or sexual harassment. *Dawson v. Entek Int'l*, 662 F Supp 2d 1277, 1291 (D Or 2009) (citations omitted).

Asaro has submitted no evidence that Sealy acted with the requisite intent to inflict severe emotional distress as required under the first element. He has no facts tending to show that Sealy intended to cause emotional distress by issuing warnings and assigning him tasks. At most, he has submitted evidence that Hicks wanted to get rid of him, but, as discussed above, her motive cannot be imputed to Coley who took the disciplinary actions against him. Moreover, her alleged motive was to have Asaro fired, not to inflict mental or psychological harm.

As to the third element, Sealy's actions cannot be construed as transgressing the bounds of socially tolerable conduct. Those actions include issuing warnings to Asaro and other employees for failing to meet performance expectations, but discipline alone is not enough. *See Madani*, 312 Or at 204. Further, these warnings were later withdrawn and did not financially impact Asaro. Being required to enter a dumpster to remove corner guards does not meet the

23 - OPINION AND ORDER

outrageous conduct prong in this case either because this was a work-related task with a well-known purpose and Asaro was the only trained employee available to perform the task. The alleged sexual harassment plot certainly constitutes misconduct, but no action was taken. An IIED claim requires more than toleration of misconduct by employees. *See Lewis v. Oregon Beauty Supply Co.*, 321 Or 616, 627-28, 733 P2d 430, 437 (1987).

Asaro argues that the employee/employer relationship is a special relationship that allows a reckless infliction of emotional distress claim, relying on *Conway v. Pac. Univ.*, 129 Or App 307, 310, 879 P2d 201, 202 (1994). However, *Conway* relied on *Bodewig v. K-Mart, Inc.*, 54 Or App 480, 635 P2d 657 (1981), the reasoning of which was rejected in *McGanty*. *See Navarette v. Nike, Inc.*, No. 05-1827-AS, 2007 WL 221865 * 3-4 (D Or Jan. 26, 2007).

Because the undisputed facts are insufficient to prove an IIED claim, Sealy is granted summary judgment against Count 4.

## **ORDER**

For the reasons set forth above, Sealy's Motion for Summary Judgment (docket # 34) is GRANTED, and this case is dismissed..

DATED this 19th day of November, 2010.

s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge